Cahill v. Ski Liberty Operating Corp.

C.P. of Adams County, no. 06-8-29.[1]

*Daryl E. Christopher,* for plaintiffs.
*Hugh M. Emory,* for defendants.

GEORGE. *J.,* November 14, 2006—On January 17, 2004, Timothy Joseph Cahill[2] was skiing at the Liberty Mountain Ski Resort located in Carroll Valley, Adams County, Pennsylvania.[3] Cahill, an experienced skier, enjoyed skiing privileges at Ski Liberty through his purchase of a season pass. Cahill applied for the 2003-2004 season pass through a website operated by Ski Liberty. In order to complete the application, the website required Cahill to acknowledge that he agreed to the terms of a "season pass and advantage card release agreement" by clicking the "okay" box on the web page. The web page included an explanation of the terms which included a release and assumption of risk clause. Cahill's application on the website was followed up with a writ-

1. The parties consistently used the incorrect caption throughout their pleadings. Apparently, the defendants misread the caption number on the writ of summons issued in this matter to read 06-8-29 rather than the proper caption number of 06-S-29. When the defendants praeciped for a rule to file a complaint, their praecipe carried the wrong number. All subsequent pleadings have duplicated that initial error. Accordingly, all are advised that the correct caption number, 06-S-29, should be used on all pleadings henceforth.

2. Timothy Joseph Cahill will be referred to throughout this pleading as "Cahill." Plaintiff, Anne Leslie Cahill, is the wife of Timothy Joseph Cahill and has filed a derivative claim for loss of consortium.

3. Liberty Mountain Ski Resort is owned and operated by Snow Time Inc., which is a Delaware corporation operating in Adams County. Collectively, the parties will be referred to as "Ski Liberty."

ten application which Cahill signed on January 11, 2004. In a conspicuous location immediately above his signature, the written application provides that he agreed to be legally bound by the "Notice of risk", "Assumption of risk", "Release from liability", and "Acknowledgement" provided to him by Ski Liberty.[4]

On the date in question, Cahill fell on an icy area while skiing near the bottom of Eastwind and Strata slopes. He claims that although he was unaware of ice in this area, Ski Liberty knew of the danger since, during the previous

---

4. Both the website and the written documents accompanying the application provide as follows:

"*Notice Of Risk*

"I understand and accept the fact that snowsports (skiing . . .) in their various forms, including the use of lifts are dangerous with inherent and other risks. These risks include but are not limited to . . . ice and icy conditions . . . All of the inherent and other risks of snowsports present the risk of permanent catastrophic injury or death.

"*Assumption Of Risk*

"Understanding and agreeing that snowsports are hazardous, I voluntarily and expressly assume for myself the risk of injury while participating in these sports.

"*Release From Liability*

"*In consideration of the use of the ski area's facilities, I AGREE NOT TO SUE Ski Liberty Operating Corp., Whitetail Mountain Operating Corp., and/or Ski Roundtop Operating Corp., their owners, agents and employees, if injured while using the facilities, regardless of any negligence on the part of the Ski Area or its employees. . . .*

"*Acknowledgement*

"In consideration of being permitted to use the facilities at Liberty Mountain Resort, Whitetail Mountain Resort and Ski Roundtop, I expressly acknowledge:

"(1) I have read and understand the 'Notice of Risk,' 'Assumption of Risk,' 'Release from Liability,' 'Be Aware, Ski with Care,' and 'Your Responsibility Code.' . . .

"(3) I voluntarily assume for myself all the risks involved in snowsports." (emphasis in original)

evening, a snow-making water hydrant broke releasing water which ultimately froze into ice because of the cold conditions. As a result of his fall, Cahill claims to have severely injured his face, back, ribs and left hand. A complaint was filed on March 17, 2006, claiming that Ski Liberty was negligent for failing to properly maintain the ski slopes in a safe manner and/or failing to adequately warn concerning the icy area. Ski Liberty has filed an answer with new matter alleging Cahill assumed the risk of his injuries and released Ski Liberty from all liability. Ski Liberty currently moves for judgment on the pleadings.

A motion for judgment on the pleadings is in the nature of a demurrer as it provides the means to test the legal sufficiency of the pleadings. All of the plaintiffs' allegations must be taken as true for the purposes of judgment on the pleadings. *Bata v. Central-Penn National Bank of Philadelphia,* 423 Pa. 373, 378, 224 A.2d 174, 178 (1966). Unlike a motion for summary judgment, the power of the court to enter a judgment on the pleadings is limited by the requirement that the court consider only the pleadings themselves and any documents properly attached thereto. *Nederostek v. Endicott-Johnson Shoe Co.,* 415 Pa. 136, 138, 202 A.2d 72, 73 (1964). A motion for judgment on the pleadings should be granted only where the pleadings demonstrate that no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law. *Dunn v. Board of Property Assessment, Appeals and Review of Allegheny County,* 877 A.2d 504, 510 n.12 (Pa. Commw. 2005). Since I find that the release entitles Ski Liberty to judgment as a matter of law, the complaint will be dismissed.

Although disfavored under Pennsylvania law, exculpatory agreements, or releases, are valid provided they comply with the safeguards enunciated by our Superior Court in *Zimmer v. Mitchell and Ness,* 253 Pa. Super. 474, 385 A.2d 437 (1978), *aff'd,* 490 Pa. 428, 416 A.2d 1010 (1980) as follows:

"The contract must not contravene any policy of the law. It must be a contract between individuals relating to their private affairs. Each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction . . . [T]o be enforceable, several additional standards must be met. First, we must construe the agreement strictly and against the party asserting it. Finally, the agreement must spell out the intent of the parties with the utmost particularity." *Id.* at 478, 385 A.2d at 439. Applying this criteria, I find the releases executed by Cahill to be valid.

The pleadings support a conclusion that the present agreement is not one of adhesion. Cahill was not forced to enter into the contract, but did so voluntarily in order to ski at Liberty Mountain. The agreement between the parties related to Cahill's engaging in a matter of personal choice without any evidence of coercion or inducement negating the volitional nature of his act. Clearly, this activity is not essential to Cahill's personal or economic well-being but, rather, was a purely recreational activity. See *Kotovsky v. Ski Liberty Operating Corporation,* 412 Pa. Super. 442, 603 A.2d 663 (1992) (holding that exculpatory agreement signed by skier injured in downhill race was valid).

The releases also do not contravene public policy. The clauses were purely private in nature and in no way affect the rights of the public. In fact, releases such as that before the court are actually in furtherance of public policy. Our state legislature, in enacting 42 Pa.C.S. §7102(c) (relating to comparative negligence), specifically recognized that there are inherent risks in the sport of downhill skiing and specifically preserved the doctrine of assumption of risk as it applied to downhill skiing injuries and damages. 42 Pa.C.S. §7102(c). This suggests that it is the policy in this Commonwealth to enforce the doctrine of assumption of risk for persons knowingly engaging in downhill skiing. *Kotovsky, supra* at 448, 603 A.2d at 666.

The releases executed by Cahill are unambiguous in both their language and intent. The language spells out with particularity the intent of the parties. The captions clearly advise patrons of the contents and purpose of the document as both a notice of risk and a release of liability. The waiver uses plain language informing the skier that downhill skiing is a dangerous sport with inherent risks including ice and icy conditions as well as other forms of natural or man-made obstacles, the condition of which vary constantly due to weather changes and use. Importantly, after advising a patron of these dangers, the documents unequivocally, in both bold and capital letters, release Ski Liberty from liability for any injuries suffered while using the ski facilities regardless of any negligence on the part of Ski Liberty, its employees, or agents. The application of the releases to use of Ski Liberty facilities is not only spelled out specifically in the document but is reinforced by other references to the releases throughout the body of the document.

Cahill received, and acknowledged receipt, of the release from liability on two separate occasions. Notably, the first occasion appears to have been well in advance of the sale thereby allowing him ample opportunity to read it before using the facilities.[5] This factual background reveals that the intent of the parties was imminently clear and spelled out with the utmost particularity in plain language. Therefore, under the criteria set forth in *Zimmer*, the releases are valid.

Perhaps in recognition of the viability of the releases at issue, Cahill does not challenge their validity but, rather, disputes their application to the current facts. In this regard, Cahill suggests that a hazardous condition created by Ski Liberty, and known to exist by the resort, is not an inherent risk to the sport of skiing thereby making the exculpatory agreements and assumption of risk doctrine inapplicable. In support of this argument, Cahill cites *Crews v. Seven Springs Mountain Resort*, 874 A.2d 100 (Pa. Super. 2005). In *Crews*, the Superior Court reviewed the trial court's dismissal of a complaint wherein the plaintiff sought damages for injuries received when the plaintiff was involved in a collision with another snowboarder who was a minor under the influence of alcohol. In reversing the trial court, the Superior Court concluded that the plaintiff did not assume the risk of a collision with an underage drinker on a snowboard since the same is not an inherent risk of the sport of skiing.

Cahill's reliance on *Crews* is misplaced. Primarily, *Crews* specifically limited the issue before the court to

---

5. The written application reveals an order date for the season pass of October 31, 2003 which circumstantially establishes the date application was submitted by Cahill over the internet.

an analysis of the application of the assumption of risk doctrine. Instantly, this court addresses a separate and distinct issue concerning the validity of an exculpatory agreement. Although these different issues are dealt with simultaneously in a number of court opinions, they are indeed distinguishable and require separate analysis. Compare *Zimmer v. Mitchell and Ness, supra* with *Crews v. Seven Springs Mountain Resort, supra.* Accordingly, I find *Crews* to be inapplicable to the issue of whether the release agreement entered by Cahill is valid.

Since I have found that Cahill knowingly and voluntarily entered into an exculpatory agreement releasing Ski Liberty from both the inherent dangers of downhill skiing and any negligence on the part of Ski Liberty or its employees, it is not necessary to undertake a detailed analysis of application of the assumption of risk doctrine to the current matter. Nevertheless, as noted, our legislature has expressly preserved assumption of risk as a defense to actions for downhill skiing injuries. 42 Pa.C.S. §7102(c). Moreover, Ski Liberty provided Cahill prior and detailed notice of the dangerous and inherent risks of skiing. The notice is both thorough and exhaustive. Cahill is an experienced skier who obviously has personal knowledge of the inherent dangers involved in the sport. His experience undoubtedly has taught him that the sport of skiing is not conducted in the pristine and controlled atmosphere of a laboratory, but rather occurs in the often hostile and fickle atmosphere of a south central Pennsylvania winter. Those familiar with skiing, such as Cahill, are aware that nature's snow is regularly supplemented with a man-

made variety utilizing water and a complex system of sprayers, hydrants and pipes. Human experience also teaches us that water equipment frequently leaves puddles which, in freezing temperatures, will rapidly turn to ice. The risks caused by this variety of ever-changing factors are not only inherent in downhill skiing but, perhaps, are the very nature of the sport. The self-apparent risks were accepted by Cahill when he voluntarily entered into a business relationship with Ski Liberty. He chose to purchase a ski ticket in exchange for the opportunity to experience the thrill of downhill skiing. In doing so, he voluntarily assumed the risks that not only accompany the sport but may very well add to its attractiveness.

Since I find the exculpatory agreement valid, Cahill's claim cannot be sustained. Similarly, Mrs. Cahill's derivative claim for loss of consortium must also automatically fail as a matter of law. See *Kiers by Kiers v. Weber National Stores Inc.,* 352 Pa. Super. 111, 507 A.2d 406 (1986); *Scattaregia v. Shin Shen Wu,* 343 Pa. Super. 452, 495 A.2d 552 (1985); and *Little v. Jarvis,* 219 Pa. Super. 156, 280 A.2d 617 (1971).

For the foregoing reasons, defendants' motion for judgment on the pleadings is granted.

## ORDER

And now, November 14, 2006, for the reasons set forth in the attached opinion, defendants' motion for judgment on the pleadings is granted. The prothonotary is directed to enter judgment in favor of the defendants, Ski Liberty Operating Corp. and Snow Time Inc.